ARKANSAS HOSPITAL ASSOCIATION, et al.
*v.* ARKANSAS STATE BOARD OF PHARMACY and
Arkansas Pharmacists' Association

88-124                                                   763 S.W.2d 73

Supreme Court of Arkansas
Opinion delivered January 17, 1989
[Rehearing denied February 20, 1989.*]

*Purtle, J., would grant rehearing.

*Wallace, Dover & Dixon,* for appellant.

*Steve Clark,* Att'y Gen., by: *J. Blake Hendrix,* Asst. Att'y Gen., for appellee Arkansas State Board of Pharmacy.

*Arnold, Grobmeyer & Haley, A Professional Association,* for appellee Arkansas Pharmacists' Association.

ROBERT H. DUDLEY, Justice. ■ Ark. Code Ann. § 17-91-607(a) (1987) distinguishes between nonprofit hospitals and for-profit hospitals by allowing for-profit hospitals to hold retail pharmacy permits, but not allowing nonprofit hospitals to do so, unless they held such a permit on the effective date of the statute.

The appellants, a group of nonprofit hospitals and a trade association, filed suit seeking to enjoin the appellee, the State Board of Pharmacy, from enforcing the statute. The appellants below argued that the statute violated their right to equal protection of the laws as guaranteed by the fourteenth amendment to the Constitution of the United States, and by article 2, section 18 of the Constitution of Arkansas. The trial court dismissed the complaint at the conclusion of the appellants' case. We affirm that ruling.

██ On an equal protection challenge to a statute, it is not our role to discover the actual basis for the legislation. Instead, we are merely to consider whether any rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives, so that the legislation is not the product of utterly arbitrary and capricious government purpose and void of any hint of deliberate and lawful purpose. *Streight* v. *Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). Further, the party challenging the legislation has the burden of proving that the act is not rationally related to achieving *any* legitimate objective of state government under any reasonably conceivable state of facts. *Streight*, 280 Ark. at 214.

In this case a rational basis does exist for the legislation; the prevention of drug diversion. Drug diversion is the diversion of drugs from one wholesale submarket to another with a resulting loss of control over the drugs.

In June 1985, the Subcommittee on Oversight and Investigation of the Committee on Energy and Commerce of the United States House of Representatives issued a staff report on the subject, commonly referred to as the Dingell report. The report discusses the existence and method of operation of the wholesale submarket, or diversion market, and how it prevents effective control over, and even routine knowledge of, the true source of drugs. It states that, as a result, pharmaceuticals which have been mislabeled, misbranded, improperly stored or shipped, have passed their expiration date, or are bald counterfeits, are injected into the national distribution system for ultimate sale to consumers. The report states that nonprofit hospitals buy at below average wholesale price under a special exemption to federal antitrust laws. "These nonprofit institutions that buy in excess of

their legitimate needs and then resell the excess are a significant and growing source of diverted merchandise." *Staff of House Committee on Energy and Commerce*, 99th Cong., 1st Sess., *Report on Drug Diversion* 2 (Comm. Print 1985).

The report further provides:

*Nonprofit Institution Diversion*

As indicated in a previous section, nonprofit institutions that have purchased pharmaceuticals beyond their needs have diverted the excess to the wholesale market for many years. Recently, however, and in the face of apparent prohibitions against resales by the Robinson-Patman Act (15 U.S.C. 13), the volume of merchandise and the number of diversions from nonprofit institutions appear to have increased dramatically.

This is not to say that the practice is new. Extensive hearings in 1967 and 1969 before the House Select Committee on Small Business provided a forum for complaints that failure to enforce the Robinson-Patman Act was unfairly damaging retail druggists.

. . .

An entire industry has sprung up whose sole purpose appears to be to solicit nonprofit hospitals to purchase excess pharmaceuticals using their special discount, which products are then immediately resold to the broker or wholesaler for ultimate resale to the retailer. The current head of the California Board of Pharmacy told the Subcommittee staff that it was his guess that hospital diversion was the leading source of products for the diversion market in his state.

The Subcommittee staff has identified companies in California, Texas and New Jersey that are making such solicitations.

*Id.* at 21, 23.

The General Assembly may well have been aware of the diversion market and decided to limit its operation. Obviously, nonprofit hospitals could not rationally be prevented from buying

authorized drugs for their own in-house use, but they rationally could be prevented from selling drugs at retail to someone who has no present connection with the hospital. This would eliminate the possibility of a nonprofit hospital purchasing drugs at a discount for its own use, or in-house use, and then diverting those drugs to its retail pharmacy. It would also prevent it from purchasing drugs for retail use from other nonprofit institutions. Thus, a rational basis exists which demonstrates a connection with a legitimate state objective.

The appellants next argue that the act is too broad, and therefore, the state classification has no rational basis. Simply stated, they argue that the General Assembly should have only made the retail sale of pharmaceuticals purchased at the discount nonprofit rate unlawful.

The Robinson-Patman Act, 15 U.S.C. § 13, prohibits drug diversion by making the retail sale of pharmaceuticals purchased at the discount nonprofit rate unlawful. The General Assembly may well have been aware of the federal law and realized that even though drug diversion was a federal crime, it still was a growing problem; that simply classifying something as a crime did not necessarily solve the problem. Thus, the General Assembly may have chosen to limit diversion by disallowing any connection between a nonprofit hospital and a retail pharmacy.

The fact that the Arkansas statute is broader in scope than the Robinson-Patman Act does not invalidate the state statute, for, in applying the rational basis test, the judiciary will not act as a superlegislature to question the means employed to accomplish the state objective. *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 316, 317 (1976). "As long as the classificatory scheme . . . rationally advances a reasonable and identifiable governmental objective, we [the judiciary] must disregard the existence of other methods of [achieving the legislative goal] that we, as individuals, perhaps would have preferred." *Schweiker* v. *Wilson*, 450 U.S. 221, 235 (1981).

The fact that the General Assembly chose to limit drug diversion by eliminating retail sales by nonprofit hospitals, rather than solely by making such actions a crime, does not render the legislation overly broad.

Affirmed.

HICKMAN, J., concurs.

PURTLE, J., dissents.

DARRELL HICKMAN, Justice, concurring. Sometimes a decision has to be defined by what it is not.

This is not a decision affecting consumers. The nonprofit hospitals do not pretend they want to operate drug stores to reduce the cost of drugs to the public. Indeed, they candidly seek to make profits.

This case is not one of discrimination to prevent competition. Through advertising and discount drug stores, there exists a competitive atmosphere from which the public benefits. This is not a decision that prohibits a hospital from performing a function necessary to its existence.

The question is purely, can the legislature prohibit a nonprofit hospital, which it has granted special privileges and concessions, from opening an unnecessary, profitable business?

Nonprofit corporations are probably misunderstood and, perhaps misnamed. They make profits and, though they don't have owners or stockholders, an establishment exists to run them. The profits of such a corporation should inure to the benefit of those served by the corporation. But sometimes, these institutions forget the real reason for their charters and simply feed the employees, directors, friends and associates of the corporation rather than devote the profits to services.

I point no fingers but merely note that there are no parties to this suit who have totally unselfish motives. There is no genuine question of due process of law or discrimination involved.

The only question is: can any conceivable reason be found to justify the legislation? It can.

JOHN I. PURTLE, Justice, dissenting. The majority opinion is based upon a belief that a rational basis exists for this legislation, i.e. the prevention of drug diversion. This basis was completely disproved at the trial level. The fact that the Congress, or one of its agencies, found some drug diversion occurring in other parts of the country is no rational basis for finding it will occur in

Arkansas.

Not only was there evidence that no diversion has occurred in Arkansas, there was evidence that no such diversion was likely to occur. The majority opinion speculates that the General Assembly may have been aware of the "diversion" market and decided to prevent it from happening in Arkansas.

The Baptist Medical Systems presented testimony that they operated an in-house drug distribution system as well as a "for profit" pharmacy in one of the buildings. As I understand the legislation, this "for profit" pharmacy is "grandfathered" in and will be allowed to continue business. On the other hand, St. Vincent's Infirmary, a well known medical institution in this area, will be unable to establish a drug store on its campus. At the same time, the Doctors Hospital, a "for profit" hospital, will be allowed to continue operating its drug store for profit, as will any other private hospital. The only motivation behind this lawsuit is *profit*. The pharamacists want to make the profit that the "not for profit" institutions are making on their "for profit" pharmacies. The legislation gives one class of persons priority or preferential treatment over others and the inevitable result is to increase the price of drugs to the consumer. This law is, in my opinion, in violation of the Due Process and Equal Protection clauses of the Constitution. This piece of special legislation, which is also prohibited by the Arkansas Constitution, should be declared void.