WAL-MART STORES, INC. *v.* AMERICAN DRUGS, INC.,
Tim Benton d/b/a Mayflower Family Pharmacy and
Jim Hendrickson d/b/a Baker Drug

94-235 891 S.W.2d 30

Supreme Court of Arkansas
Opinion delivered January 9, 1995
[Rehearing denied February 13, 1995.*]

*Special Justices Walter R. Niblock, A. Watson Bell, and Barbara P. Bonds would grant rehearing; Dudley, Corbin, and Roaf, JJ., not participating.

216

*Mayer, Brown & Platt,* by: *Andrew L. Frey; Friday, Eldredge & Clark,* by: *William H. Sutton;* and *Williams & Anderson,* by: *Peter G. Kumpe* and *J. Leon Holmes,* for appellant.

*Brazil, Clawson, Adlong, Murphy & Osment,* by: *Matthew W. Adlong, Pamela Osment,* and *Michael L. Murphy,* for appellees.

ROBERT L. BROWN, Justice. Appellant Wal-Mart Stores, Inc. appeals from an order of the chancery court enjoining it from engaging in below-cost sales and assessing damages against it for violation of the Arkansas Unfair Practices Act. Wal-Mart argues on appeal: (1) that the chancery court erred as a matter of law in finding that it sold products below cost for the purpose of injuring competitors and destroying competition; (2) that the chancery court erred in considering individual articles to determine cost and profit rather than the entire product lines, or "market basket;" and (3) that the chancery court's interpretation of the Arkansas Unfair Trade Practices Act violates the Arkansas Constitution and the United States Constitution. We agree with Wal-Mart on the first point raised, and we reverse and dismiss.

This case deals with the Conway Wal-Mart store located in Faulkner County. The appellees in this case, American Drugs, Inc., Tim Benton d/b/a Mayflower Family Pharmacy,[1] and Jim Hendrickson d/b/a Baker Drug, brought suit in circuit court against Wal-Mart for violation of the Arkansas Unfair Practices Act, codified at Ark. Code Ann. § 4-75-201, *et seq.* (Repl. 1991). Specifically, they contended that Wal-Mart was selling individual items below cost for the purpose of injuring competitors and destroying competition in violation of § 4-75-209(a)(1) of the Act. They sought injunctive relief and damages. The appellee drug stores moved for summary judgment, and Wal-Mart did likewise. The matter was transferred to chancery court, and that court found that a violation of the Act had occurred due to below-cost sales.

---

[1] This appellee is also referred to in the record as Mayflower Family Drug Center.

It then enjoined Wal-Mart from selling articles below cost at the Conway store and further found that the appellees had been damaged in the amount of $42,407 (American Drug), $33,767 (Baker Drug), and $20,295 (Mayflower Family Pharmacy). The chancery court trebled the damages as a penalty.

In its order granting relief to the appellee drug stores, the chancery court made these findings of fact:

- that retail sales of pharmaceuticals and health and beauty aids had expanded during a period of strong commercial growth in Faulkner County and had almost doubled from 1988 to 1990 — from $5,184,000 in 1988 to $9,897,000 in 1990;

- that the number of pharmacies in Faulkner County had also increased from five in 1967 to twelve in 1981 to fourteen in 1992 and that Conway Wal-Mart began selling prescription drugs in 1987;

- that other large outlets for the same products in Faulkner County and additional competitors of the appellee drug stores were Kroger, Harvest Foods, and Fred's;

- that the prices for the relevant product lines at issue were slightly higher in the Little Rock Wal-Mart stores and substantially lower in the Clinton and Flippin Wal-Mart stores;

- that Wal-Mart determined the "everyday price" for its products at its headquarters in Bentonville, that store managers could not raise the price for a product above that set price, but that store managers could lower prices after monitoring prices charged by competitors in the market area without regard to the cost to Wal-Mart of individual items;

- that the lowered price "is frequently below Wal-Mart's cost of acquiring some of these products in highly competitive markets," and that this had occurred at the Conway Wal-Mart;

- that the store had advertised individual items for sale below Wal-Mart's acquisition cost;

- that Conway Wal-Mart had displayed a "scorecard" at

the front of its store comparing its prices on certain items with local retailers like the appellee drug stores;

- that Wal-Mart's stated policy in this regard was to "meet or beat" retail prices of competitors, to maintain "low-price" leadership in the local marketplace, and to "attract a disproportionate number of customers into a store to increase traffic;"

- that by generating traffic, Wal-Mart could engender sales of other items which would offset losses from sales of below cost items; and

- that Conway Wal-Mart's overall product line for pharmaceuticals and health and beauty aids was sold above cost, and its pharmacy was profitable.

The chancery court then stated: "[T]here is no direct evidence that the purpose of Wal-Mart's pricing policy or Conway Wal-Mart's implementation of the policy is to injure competitors or to destroy competition. However, such purposes may be inferred from the stated policy, the effects of the stated policy and other circumstantial evidence." The court found that the appellee drug stores had lost sales to Conway Wal-Mart due to the below-cost policy, and that the growth in sales and profits for those drug stores had substantially decreased.

Though not included in the chancery court's findings, there was also testimony from the owner of Baker Drug that its gross profits were $324,000 in 1988 and $341,000 in 1992. The owner of Mayflower Family Pharmacy testified that his net profits had been reduced since 1990 when the store realized $120,000 in net profits but that for the first six months of 1993, net profits for the store were about $40,000. According to certified public accountant Stephen Humphries, who testified for Wal-Mart, American Drugs showed an increase in drug sales from 1987 to 1990, then in the 1991-1992 period the sales were "flat," but in "annualizing" the sales for 1993, the sales increased again.

The crux of the court's order follows:

The Court finds that purpose to injure competitors and destroy competition cannot be inferred from below cost advertising and sales alone. There must be other proof of intent or purpose. A person's purpose or intent, being a

state of mind, ordinarily cannot be proven by direct evidence, but may be inferred from other circumstances. *Alford v. State*, 34 Ark. App. 113, 806 S.W.2d 29 (1991).

The Court finds from the following circumstances that Conway Wal-Mart advertised and sold pharmaceutical and health and beauty products below cost for the purpose of injuring competitors and destroying competition:

1. The number and frequency of below cost sales.

2. The extent of below costs sales.

3. Wal-Mart's stated pricing policy — "meet or beat the competition without regard to cost."

4. Wal-Mart's stated purpose of below cost sales — to attract a disproportionate number of customers to Wal-Mart.

5. The in-store price comparison of products sold by competitors, including Plaintiffs.

6. The disparity in prices between Faulkner County prices of the relevant product-lines and other markets with more and less competition.

The chancery court then granted the injunction against below-cost sales. The chancellor also assessed treble damages as a penalty as described above. *See M.L. Sigmon Forest Products, Inc. v. Scroggins*, 250 Ark. 385, 465 S.W.2d 673 (1971).

All parties agree that this case turns on the interpretation of § 4-75-209(a)(1) of the Arkansas Unfair Practices Act, which reads in part:

It shall be unlawful for any . . . corporation . . . engaged in business within this state, to sell, offer for sale, or advertise for sale any article or product . . . at less than cost thereof to the vendor . . . for the purpose of injuring competitors and destroying competition.

As the chancery court correctly pointed out, this statute is penal in nature and must be strictly construed in favor of those upon whom the burden of the penalty is sought to be imposed, in this case Wal-Mart. *See Beam Bros. Contractors v. Monsanto Co.,*

*Inc.*, 259 Ark. 253, 532 S.W.2d 175 (1976); *Davis* v. *Fowler*, 230 Ark. 39, 320 S.W.2d 938 (1959). The chancery court also was correct in stating that for a violation to occur under § 4-75-209(a)(1), below-cost sales must be made *for the purpose of destroying competition.* The court found an inference of this purpose predicated on the aforementioned six circumstances.

In analyzing the six factors which led to the chancery court's inference of specific intent, the first four circumstances relate to below-cost sales. However, § 4-75-209(a)(1) is clear that mere proof of below-cost sales is not sufficient to prove a violation of the Act. The chancery court agreed with this but found an intent to destroy competition based on the extent, frequency, and number of those sales. Despite this finding, the court fails to present details of Wal-Mart's practice regarding specific articles which led to a violation of § 4-75-209(a)(1). The individual items sold below cost, the frequency of those sales, the duration of those sales, and the extent of such sales are not revealed in the chancery court's opinion. And that is a critical point in this case.

We do know from the testimony of Michael Bess, the pharmacist at Conway Wal-Mart, that he did not consider the appellee drug stores to be competitors for prescription drugs and pharmaceuticals. Bess, who was called as a principal witness by the appellee drug stores, testified that the appellees were not the competition but that Fred's, Kroger, and Alco were because those were the chain stores. Bess was responsible for 2,500 items in the pharmacy. Of those items, he routinely determined the 100 most popular articles, checked Fred's and Kroger and Alco to ascertain their prices on the maintenance drugs, which were the repeat prescriptions, and then tried to beat those prices. Included within the 100 items would generally be 30 to 40 maintenance drugs like Dilantin or Tagamet, which were placed on a competition list. When asked how many drugs on the competition list were sold below cost, he answered: "Very few. It depends on the competition price." He did add that on one day — March 24, 1990 — the items on the competition list represented 29 percent of his business and that on that day there was a loss in total sales of those items. He concluded, however, that this could have been attributable to multiple sales of one or two below-cost items. The chancery court did find that the pharmacy at Conway Wal-Mart was profitable as a whole.

█ We discern no proof in the record of this case that Wal-Mart specifically intended to destroy competition with regard to any one article like Crest Toothpaste or Bayer Aspirin or Dilantin by selling below cost for a sustained period of time. What is evidenced is that Wal-Mart regularly would sell varying items below cost as loss leaders to entice people into its store and increase traffic. The loss-leader items would change on a regular basis. That strategy of selling below the competitors' price and even below Wal-Mart's own cost, which Wal-Mart admits to, is markedly different from a sustained effort to destroy competition in one article by selling below cost over a prolonged period of time. Our statute — § 4-75-209(a)(1) — does not make loss leaders illegal, and for that reason the chancery court erred in inferring a purpose to destroy competition from a loss-leader strategy.

We observe further that if the chancery court's statutory interpretation was correct, any business using the loss-leader approach to attract customers on a regular basis would be in violation of the Act. That kind of expansive interpretation runs directly counter to our oft-stated policy of strict construction of penal statutes in favor of those upon whom the burden will fall. *See Beam Bros. Contractors* v. *Monsanto Co., Inc., supra.* Our statute plainly does not contemplate a *prima facie* case of predation based on loss-leader sales, and we are not willing to invalidate, and indeed render illegal, the technique of using loss-leader products or services without a clear directive from the General Assembly that that is now the public policy of the State of Arkansas.

██ The chancery court also referenced two additional circumstances which it determined contributed to an inference of purposeful intent:

> 1. The in-store price comparison of products sold by competitors, including Plaintiffs.

> 2. The disparity in prices between Faulkner County prices of the relevant product-lines and other markets with more and less competition.

There is certainly no fault in comparative pricing. On the contrary, that tactic appears to foster and encourage competition

which is one of the purposes of the Arkansas Unfair Practices Act. *See* Ark. Code Ann. § 4-75-202 (Repl. 1991). Nor is the fact that Wal-Mart stores in other localities varied the prices of their products in response to local competition sufficient to prove that Conway Wal-Mart intended to destroy competition in Faulkner County.

Admittedly, there is a point where competitive pricing ends and predatory pricing begins. The Eighth Circuit Court of Appeals has discussed the difficulty in distinguishing the two in the context of the Sherman Act:

> The difficulty, of course, is distinguishing highly competitive pricing from predatory pricing. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to new competition, or to a downturn in market demand. Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition. *See e.g., Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 231 (1st Cir. 1983).

*Morgan* v. *Ponder*, 892 F.2d 1355, 1358-1359 (8th Cir. 1989).

There is also a distinct danger in inferring, first, specific predatory intent and, secondly, purposeful destruction of competition from sales below cost. That involves a double inference, as the Eighth Circuit Court of Appeals has recognized. *See Henry* v. *Chloride*, 809 F.2d 1334, 1344 (8th Cir. 1987). There is no question that double inferences stretch a circumstantial case to its limits. But the Idaho Supreme Court has also recognized additional problems with too heavy a reliance on inferences to determine specific intent in an antitrust case:

> Nevertheless, a finding that a defendant has engaged in a particular predatory or illegal act, such as selling below cost, is not the equivalent of finding specific intent, but is merely a basis from which such intent may be inferred. Isolated or occasional instances of selling below cost, while predatory or illegal in nature, do not necessarily indicate a specific intent to monopolize. To hold otherwise would render the requirement of specific intent a nullity. As one court has stated in the same context, "Too

heavy a reliance on circumstantial evidence incurs the risk of reducing almost to the point of extinction the existence of the requirement." *William Inglis & Sons Baking Co.* v. *I.T.T. Continental Baking Co.*, 668 F.2d at 1027. The existence of specific intent must, therefore, be determined by weighing all of the circumstances in the particular case, including the nature of the conduct, its consistency and duration, the conditions of the market, and characteristics of the defendant. *William Inglis & Sons Baking Co.* v. *I.T.T. Continental Baking Co., supra.*

*Pope* v. *Intermountain Gas Co.*, 646 P.2d 988, 997 (Idaho 1982).

In the case before us, the loss-leader strategy employed by Conway Wal-Mart is readily justifiable as a tool to foster competition and to gain a competitive edge as opposed to simply being viewed as a stratagem to eliminate rivals altogether. We are further sensitive to the ultimate purpose of the Arkansas Unfair Practices Act — to foster competition and to protect the public against the destruction of competition and the creation and perpetuation of monopolies. Ark. Code Ann. § 4-75-202 (Repl. 1991). Certainly legitimate competition in the market place can, and often does, result in economic injury to competitors. A competitor that has been injured by legitimate competitive pricing, though, should not be permitted to use the Arkansas Act as a fountain for recouping its losses. *See Henry* v. *Chloride, supra*, 809 F.2d at 1341 (dictum). In short, the circumstances of this case are not sufficiently egregious to prove that Conway Wal-Mart crossed the line with regard to predatory prices and purposeful destruction of competition.

There are two other points that militate against the chancery court's construction and application of the Act. The appellee drug stores are far from destroyed. They all continued into 1993 making a profit. Though the Act renders a specific intent to destroy competition as the violation and does not mandate either the actual destruction of competition or even the likelihood of that happening as elements of the unfair practice, it seems only logical that the continued profitability of appellee drug stores and the existence of robust competition in Faulkner County have some bearing on the matter. There is no serious suggestion that the appellees have stopped selling any article as a

result of Wal-Mart's practices or that one or more of the appellees is even considering doing so. There is simply enhanced competition in the area, and the appellees are not making the profits they once did. Other large drug outlets in the vicinity have entered the competitive fray, including Fred's, Kroger, and Harvest Foods. Faulkner County appears far from a dire situation where no competition exists in pharmaceuticals; indeed, competition there appears to be thriving.

 Secondly, we are mindful of the factors during the Depression that were the catalyst for the enactment of Act 253 of 1937, now codified as § 4-75-209(a)(1) of the Arkansas Unfair Practices Act. Those factors are expressed in the Act's Emergency Clause:

> This act is hereby declared to be an emergency measure necessary for the immediate preservation of the public peace, health and safety, within the meaning of section 1 of Article V of the Constitution, and shall therefore go into immediate effect. The facts constituting the necessity are as follows:

> The sale at less than cost of goods obtained at forced, bankrupted, close out, and other sales outside of the ordinary channels of trade is destroying healthy competition and thereby forestalling recovery. If such practices are not immediately stopped many more businesses will be forced into bankruptcy, this (sic) increasing the prevailing condition of depression. In order to prevent such occurrences it is necessary that this act go into effect immediately.

Those forced sales "outside of the ordinary channels of trade" gave rise to the Act — not loss-leader programs using varying articles with the admitted purpose to abet competition and "beat out" competitors. That is far different from a sustained below-cost effort over a substantial period of time directed at either a single article for sale or at multiple articles for sale for the purpose of gaining a monopoly in particular products. While the original intent of the Act does not decide this matter, it is certainly a factor to be considered in the overall mix.

If the policy of this State is to render illegal the loss-leader tactic or to recognize a *prima facie* case of purposeful intent to

destroy competition by below-cost sales in disparate articles that are changed on a regular basis, that policy should be clearly announced by the General Assembly in appropriate legislation. We hold that the Arkansas Unfair Practices Act, and specifically § 4-75-209(a)(1), does not provide a sufficient statutory basis for the chancery court's inference of a specific intent to destroy competition based on the facts before us. We further hold that the chancery court erred as a matter of law in concluding that purposeful intent to destroy could be inferred under these facts. Because we decide this matter on the first point, there is no need to address the other points raised by this appeal.

Reversed and dismissed.

DUDLEY and CORBIN, JJ., not participating.

Special Justices WALTER NIBLOCK, A. WATSON BELL, and BARBARA P. BONDS, dissent.

WALTER NIBLOCK, Special Justice, dissenting.

INTRODUCTION

I respectfully dissent to the opinion of the majority on all counts. Further, I am authorized to state that Special Justices Bell and Bonds join in this dissent. I would affirm the decision of Judge Reynolds, as it is my belief that the majority did not give due deference to the findings of fact of the trial court, and as a result reached a decision that I cannot subscribe to; therefore, based upon the analysis which follows I would affirm the trial court's decision.

This case presents an issue of first impression — the interpretation of the Arkansas Unfair Practices Act, codified at Ark. Code Ann. § 4-75-201 et seq. In interpreting a statute and attempting to construe legislative intent, the appellate court looks to the language of the statute, the subject matter, the remedy provided, legislative history, and other appropriate means that throw light on the subject. *McCoy* v. *Walker*, 317 Ark. 86, 89, 876 S.W.2d 252, 254 (1994) (quoting *Gritts* v. *State*, 315 Ark. 1, 864 S.W.2d 859 (1993)).

The Arkansas Unfair Practices Act (hereinafter Arkansas Act) was enacted in 1937, during the Great Depression, as a com-

panion to the Robinson-Patman amendments to the Clayton Act. This Court has stated that "the purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be literally construed that its beneficial purposes may be subserved." *Beam* v. *Monsanto Co.. Inc.,* 259 Ark. 253, 532 S.W.2d 175 (1976).

## I. PROCEDURAL HISTORY.

The Appellees, American Drugs, Inc., Tim Benton d/b/a/ Mayflower Family Pharmacy and Jim Hendrickson d/b/a/ Baker Drug, filed a complaint on December 17, 1991, in the Circuit Court of Faulkner County, alleging that the defendant, Wal-Mart Stores, Inc., advertised, offered for sale, and sold merchandise at retail for less than the cost of the merchandise to the retailer, in violation of the Arkansas Act. Appellees requested damages and an injunction against Appellant to cease and desist violating the Arkansas Act. As a result of the remedies requested, this case was transferred to the Chancery Court of Faulkner County.

After a full hearing of the testimony and evaluation of the evidence, Judge David Reynolds entered an order on October 14, 1993, finding Wal-Mart in violation of the Arkansas Act. The trial court specifically found that Wal-Mart had made sales to the public at a price below the cost of the merchandise. Citing a lack of direct evidence, the trial court found the prohibitive intent, intent to injure competitors and destroy competition, from the effects of its stated policy on the plaintiffs, and six enumerated factors.

The six factors were: (1) the number and frequency of below cost sales; (2) the extent of below cost sales; (3) Wal-Mart's stated pricing policy — "meet or beat the competition without regard to cost;" (4) Wal-Mart's stated purpose of below cost sales — to attract a disproportionate number of customers to Wal-Mart; (5) the in-store price comparison of products sold by competitors, including Plaintiffs; and (6) the disparity in prices between Faulkner County prices of the relevant product-lines and other markets with more and less competition.

On October 21, 1993, Appellant Wal-Mart requested Judge Reynolds to make additional findings of fact concerning the con-

stitutionality of the Arkansas Act as it is written and as it was applied in this case. Judge Reynolds found that the Arkansas Unfair Practices Act was constitutional on its face and in its application and did not violate either the Arkansas or the United States Constitution.

It is from this decision that the Appellant appeals.

## II. STANDARD OF REVIEW.

We review chancery cases de novo and will not reverse a finding of fact unless it is clearly erroneous. *Smith* v. *Paul*, 317 Ark. 182, 876 S.W.2d 266 (1994) (quoting *Conway Corp.* v. *Construction Eng'rs, Inc.*, 300 Ark. 225, 782 S.W.2d 36 (1986)); *Leathers* v. *Active Realty, Inc.*, 317 Ark. 214, 876 S.W.2d 583 (1994); ARCP 52(a); *Roach* v. *Concord Boat Corp.*, 317 Ark. 474, 880 S.W.2d 305 (1994); *Brasel* v. *Brasel*, 313 Ark. 337, 854 S.W.2d 346 (1993); *Milligan* v. *General Oil Co.*, 293 Ark. 401, 738 S.W.2d 404 (1987). We affirm if we find the result reached by the chancellor was correct for any reason. *Pryor* v. *Raper*, 46 Ark. App. 150, 877 S.W.2d 952 (1994); *American Investors Life Insurance Co.* v. *TCB Transportation*, 312 Ark. 343, 345, 849 S.W.2d 509, 511 (1993).

We consider the evidence in the light most favorable to the appellee. *Leathers* v. *W.S. Compton, Co.*, 316 Ark. 10, 14, 870 S.W.2d 710, 712 (1994); *Guaranty Nat'l Ins.* v. *Denver Roller Inc.*, 313 Ark. 128, 854 S.W.2d 312 (1993). The burden is upon the appellant to show that the findings are erroneous. *Leathers* v. *W.S. Compton, Co.*, 316 Ark. at 14, 870 S.W.2d at 712; *Burson* v. *Day*, 284 Ark. 515, 683 S.W.2d 917 (1985).

## III. ISSUES ON APPEAL.

### A. CHANCELLOR'S RULING IS LEGALLY ERRO-NEOUS; DOES NOT SUPPORT AN INFERENCE OF INTENT TO DESTROY COMPETITION; AN INFER-ENCE IS CONTRARY TO LEGISLATIVE INTENT.

For its first point of error, Appellant argues that the Chancellor used an improper legal standard to find the inference of intent to destroy competition. The analysis advanced by Appellant requires Appellees to establish two factors: (a) conduct incon-

sistent with a lawful purpose; and (b) knowing conduct that creates a dangerous probability of achieving a monopoly. Appellant states the Appellees did not establish these two factors, and any inference of unlawful purpose by the Trial Court is, therefore, improper and legally erroneous.

Appellees responded to this argument by stating that the Chancellor not only used the proper standard but evaluated the evidence and reached the only permissible conclusion. The evidence showed that up to thirty percent (30%) of Wal-Mart's pharmaceutical sales were below cost (R. 1808-1810); that Wal-Mart posted negative profit margins on their most competitive items in over one-half of the period under examination; and that many of the prices were below invoice or replacement cost without consideration of the additional factors mandated by Ark. Code Ann. § 4-75-209(b)(2).

Appellant's contention is unpersuasive on two points. First, Appellant fails to identify the legal standard used and how the legal standard was improperly applied. Appellant also failed to articulate the alleged "proper legal standard" for this Court to use when interpreting the Arkansas Act. Second, Appellant provides this Court with a potential framework for analysis but provides no authority or source for this framework. If Appellant does not like the statute as it is written, its remedy is in the legislature not the courts. "However this question . . . is not a matter to be addressed by the court but is within the province of the legislature. . . . [T]his is a matter which must be left to the sound discretion of the General Assembly." *State* v. *Ruiz & Van Denton*, 269 Ark. 331, 602 S.W.2d 625, 626 (1980).

Appellant's second argument concerns the inference of intent to destroy competition and that the enumerated factors identified by the Chancellor could not possibly support an unlawful inference. The burden is upon the appellant to show that the findings are erroneous. *Leathers* v. *W.S. Compton, Co.*, 316 Ark. at 14, 870 S.W.2d at 712; *Burson* v. *Day*, 284 Ark. 515, 683 S.W.2d 917 (1985). Despite their analysis of each factor, Appellants fail to articulate a legal basis to reverse the findings and conclusions of the Chancellor.

Appellant argues that the interpretation of the Arkansas Act given by the Chancellor is inconsistent with legislative intent. They

cite the Unfair Cigarette Sales Act, Ark. Code Ann. § 4-75-708(b) (Michie 1991), in which the legislature inserted a provision that below cost sales were "prima facie evidence of intent to injure competitors and destroy or substantially lessen competition." Because the legislature failed to insert a comparable provision in the Arkansas Act, Appellant argues that non-inclusion of a similar phrase "establishes that the General Assembly did not intend for unlawful intent to be inferred from below-cost sales."

The proper source of legislative intent is the language of the statute. The legislative intent of the Arkansas Act is expressed in Ark. Code Ann. § 4-75-202:

> The General Assembly declares that the purpose of this subchapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented.

The basic rule of statutory construction, to which all other interpretations must yield, is to give effect to the intent of the General Assembly. *Pugh* v. *St. Paul Fire & Marine Ins. Co.,* 317 Ark. 304, 877 S.W. 577, 578 (1994) (quoting *Roy* v. *Farmers & Merchants Ins. Co.,* 307 Ark. 213, 819 S.W.2d 2 (1991)). This Court should give effect to the expressed General Assembly intent, and in doing so, should reject the argument advanced by the Appellant. This Court adopted this language in *Beam* v. *Monsanto Co.. Inc.,* 259 Ark. 253, 532 S.W.2d 175 (1976), and should continue to construe the Arkansas Act consistent with the intent of the legislature as expressed in the statute.

The Court should decline to engage in speculation and conjecture to unearth a possible legislative intent, and should reject Appellant's contention that the legislature's failure to include a statement similar to the one found in the Unfair Cigarette Sales Act necessitates a conclusion that the interpretation of the Arkansas Act is inconsistent with legislative intent. Unlike the Arkansas Act which addresses the creation and maintenance of monopolies and discriminatory practices, the Unfair Cigarette Sales Act was enacted to address unfair and deceptive business practices. *See* Preamble to Unfair Cigarette Sales Act, Title 4, Chapter 75, Subchapter 7 (Michie 1991).

## B. VALUATION OF COST AND PROFIT — MARKET-BASKET OR SINGLE PRODUCT?

Appellant's next point of error requires this Court to examine the language of the statute and resolve the question of what price benchmark should be used to determine if the Arkansas Act has been violated. Appellant urges this Court to adopt a market basket valuation approach for the cost of goods. Under the market basket approach, a court would be required to consider other factors in addition to the invoice cost of an item allegedly for sale below cost. Appellant's economist, Dr. Leonard White, testified that the cost of an item under the market basket approach would include the product, the atmosphere of the store, the parking lot, air conditioning, and a whole group of services that surround the purchase of the alleged below cost item.

Appellees urge this Court to adopt a single product cost comparison to determine if sales below cost have occurred. Under the individual item approach, the invoice cost of a product becomes the benchmark to determine if sales below cost have occurred.

The Arkansas Act has not been interpreted on this point. The Chancellor found Wal-Mart guilty of violating § 4-75-209(a)(1), which states:

> (a)(1) It shall be unlawful for any person, partnership, firm, corporation, joint-stock company, or other association engaged in business within this state, to sell, offer for sale, or advertise for sale *any article or product,* or service or output of a service trade, at less than the cost thereof to the vendor, or to give, offer to give, or advertise the intent to give away any article or product, or service or output of a service trade, for the purpose of injuring competitors and destroying competition.

The first rule in considering the meaning of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *McCoy* v. *Walker,* 317 Ark. 86, 876 S.W.2d 252, 254 (1994) (quoting *Mountain Home School Dist.* v. *TMJ Builders,* 313 Ark. 661, 858 S.W.2d 74 (1993)). When a statute is clear, it is given its plain meaning and we do not search for legislative intent. That intent must be gathered from the plain meaning of the language used. *Pugh* v.

*St. Paul Fire & Marine Ins. Co.*, 317 Ark. 304, 877 S.W. 577, 578 (1994) (quoting *Hinchey* v. *Thomasson*, 292 Ark. 1, 727 S.W.2d 836 (1987)).

A literal reading of Ark. Code Ann. § 4-75-209 supports the Trial Court's use of a "single product" cost comparison to determine if Appellant has engaged in below cost sales in violation of the Arkansas Act. The language of § 4-75-209 refers to "any article or product" and does not include consideration of the atmosphere of the store, the parking lot, air conditioning, and a whole group of services that surround the purchase of an item. We should reject Appellant's market basket approach for establishing the price benchmarks.

## C. THE ARKANSAS ACT VIOLATES THE ARKANSAS CONSTITUTION.

Appellant argues that the Trial Court's construction of the Arkansas Act bears no rational relation to legislative purpose and violates the Arkansas Constitution, Article 2, Section 2, which states:

> All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed.

Appellant cites *Union Carbide & Carbon Corp.* v. *White River Distrib., Inc.*, 224 Ark. 558, 275 S.W.2d 455 (1955) in which this Court ruled that the Arkansas Fair Trade Act was unconstitutional, as it established minimum prices. This Court said that "the right to sell is a valuable property [that] cannot be denied." *Id.* at 561. Appellant also cites *Noble* v. *Davis*, 204 Ark. 156, 161 S.W.2d 189 (1942), in which a statute establishing minimum prices, commissions and hours of operations for barbers failed a constitutional challenge. Appellant states that this Court found that "statute had no rational relation to the public safety, health or welfare." *Id.* at 152-63. The same result should attain here. Appellant states "[t]hat these cases establish that the Arkansas Constitution recognizes that each person has a right to

sell his property and services at the price at which he chooses. That right should not be abridged except upon a compelling showing of public harm."

We review challenges to the constitutionality of statutes under the principle that statutes are presumed to be constitutional. *First National Bank* v. *Ark. State Bank Comm'n*, 301 Ark. 1, 784 S.W.2d 744 (1989). The burden of proving a statute unconstitutional is upon the party challenging it. *Urrey Ceramic Tile Co.* v. *Mosley*, 304 Ark. 711, 805 S.W.2d 541 (1991). On appeal, if it is possible to construe a statute as to meet the test of constitutionality, we will do so. *Id.; Clinton* v. *Bonds*, 306 Ark. 554, 556, 816 S.W.2d 169. In searching for any rational basis, we ask whether the created classification has a conceivable reasonable relationship to the governmental action. *Medlock* v. *Leathers*, 311 Ark. 175, 842 S.W.2d 428, 431 (1992) (quoting *Madden* v. *Kentucky*, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940)). Our task is merely to consider if *any* rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation is not the product of utterly arbitrary and capricious government and void of any hint of deliberate and lawful purpose. *Medlock* v. *Leathers*, 311 Ark. 175, 842 S.W.2d 428, 431 (1992) (quoting *Streight* v. *Ragland*, 280 Ark. 206, 214-15, 655 S.W.2d 459, 464 (1983)); *Arkansas Hosp. Ass'n* v. *Bd. of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73, 74 (1989).

The Arkansas Act addresses the creation of and perpetuation of monopolies. Appellees established at trial that Appellant sold goods below invoice cost and presented circumstantial evidence from which the Chancellor made a permissible inference of intent to destroy competition and harm competitors. Once a plaintiff has established that one of the enumerated conditions existed in a given market, this Court and any court under its jurisdiction must follow the dictates of the statute. Appellant merely alleges that the Arkansas Act as applied in this case is unconstitutional. It would require intellectual somersaults to declare that the Arkansas Act does not have *any* rational basis for its enactment by the Legislature. The task of the court "is merely to consider if any rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation is not the product of utterly arbitrary and capricious government and void of any hint of deliberate and lawful purposes."

*Medlock* v. *Leathers*, 311 Ark. 175, 842 S.W.2d 428, 431 (1992). The court should find that the Appellant failed to establish that there was no rational basis for the Arkansas Act as applied in this case.

### D. THE ARKANSAS ACT IS PREEMPTED BY FEDERAL LAW.

Appellant argues the Arkansas Act is preempted by the Robinson-Patman Amendments to the Clayton Act, which specifically addresses the weapon of predatory pricing by monopolies. *United States* v. *National Dairy Products Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561, reh. den., 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13. The doctrine of federal preemption is based upon the supremacy clause in Article VI, Clause 2, of the United States Constitution. *CIBA-Geigy Corp.* v. *Alter*, 309 Ark. 426, 834 S.W.2d 136 (1992). State laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Gibbons* v. *Ogden* 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824).

The preemption test of *Gibbons* v. *Ogden* was expanded in *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), where the Court based preemption on four factors: whether Congress expressed a clear intent to preempt state law; whether Congress occupies the field so as to leave no room for the states to supplement; whether compliance with both the state and federal laws is impossible; and whether the state law stands as an obstacle to Congress' objective or purpose. *Id.*

This Court adopted the U.S. Supreme Court's test of preemption in *Medlock* v. *Leathers*, 311 Ark. 175, 842 S.W.2d 428, 433 (1992). In deciding whether a state law would be preempted, [the Court] asked whether the state law stood as an obstacle to the accomplishment of Congress's objectives or purposes. *Medlock* v. *Leathers*, 311 Ark. 175, 842 S.W.2d 428, 433 (1992). The burden is on the moving party to prove that Congress intended to preempt state law. *CIBA-Geigy Corp.* v. *Alter*, 309 Ark. 426, 834 S.W.2d 136, 142 (1992) (quoting *Silkwood* v. *Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).

"The fact that the Arkansas statute is broader in scope than

the Robinson-Patman Act does not invalidate the state statute, for in applying the rational basis test, the judiciary will not act as a superlegislature to question the means employed to accomplish the state objective." *Arkansas Hosp. Ass'n* v. *Bd of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73, 75 (1989) (quoting *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 316-17, 96 S.Ct. 2562, 2568-69, 49 L.Ed.2d 520 (1976)). "As long as the classificatory scheme . . . rationally advances a reasonable and identifiable governmental objective, we [the judiciary] must disregard the existence of other methods of [achieving the legislative goal] that we, as individuals, perhaps would have preferred." *Arkansas Hosp. Ass'n* v. *Bd. of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73, 75 (1989) (quoting *Schweiker* v. *Wilson*, 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed. 2d 186 (1981)). We find Appellant has not established that the Arkansas Act is contrary to or in opposition to any federal statute. Further, Appellant has not demonstrated that "Congress expressed a clear intent to preempt state law; Congress occupies the field so as to leave no room for the states to supplement; [that] compliance with both the state and federal laws is impossible; and [that] the state law stands as an obstacle to Congress' objective or purpose." *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

IV. CONCLUSION.

We would hold that the Appellant has failed to prove that the Chancellor used an improper legal standard with respect to the inference of intent to injure competitors and to destroy or substantially lessen competition. We also find that the Chancellor could have found an intent to injure competitors from the evidence in the record and particularly from the testimony of David Glass, president of Wal-Mart Stores, Inc., who used language such as "aggressive," "do whatever it takes," "kill the competition's momentum," and "war zones." Appellant failed to establish that the Arkansas Act violates rights guaranteed by the Arkansas Constitution, Article 2, Section 2. Appellant also failed to establish that the Arkansas Act was preempted by federal law.

For the foregoing reasons, I would affirm the trial judge's decision.

Special Justices A. WATSON BELL and BARBARA P. BONDS join.