PORTS PETROLEUM COMPANY, Inc., of Ohio *v.* Jim
Guy TUCKER, as Governor of the State of Arkansas;
Winston Bryant, as Attorney General of the State of Arkansas;
Lone Star Company, Inc.; Thomas Oil Company; and
Arkansas Oil Marketers Association

95-705                                           916 S.W.2d 749

Supreme Court of Arkansas
Opinion delivered March 11, 1996

*Williams & Anderson*, by: *Peter G. Kumpe* and *Leon Holmes*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Angela S. Jegley*, Sr. Asst. Att'y Gen., for appellee.

*Mitchell, Williams, Selig, Gates & Woodyard*, by: *Sherry P. Bartley* and *Marshall S. Ney*, for appellees Lone Star Company, Thomas Oil Company, and Arkansas Oil Marketers Ass'n.

ROBERT L. BROWN, Justice. The issue before this court is whether the Arkansas Petroleum Trade Practices Act (Act 380 of 1993) violates the Arkansas Constitution by impinging on the due process rights, the equal protection rights, and the privileges and immunities of appellant Ports Petroleum Co., Inc. We hold that Act 380 is constitutionally infirm because of its failure to include an element of predatory intent for a violation. As a consequence, the Act is overbroad in its effect and impermissibly impinges on the due process rights of Ports Petroleum.

## I. Facts

On April 20, 1993, Ports Petroleum Company, Inc. ("Ports Petroleum") filed its complaint for declaratory judgment in chancery court. Ports Petroleum owns Fuel Mart gasoline stations in Little Rock and Jonesboro, which sell unbranded motor fuel. Lone Star and Thomas Oil sell retail gasoline in Arkansas. Through their attorneys, Lone Star and Thomas Oil contacted Ports Petroleum and threatened to sue if Ports Petroleum did not raise its price per gallon above below-cost levels. The letters asserted that Ports Petroleum was selling its gas in violation of the Arkansas Petroleum Trade Practices Act (Act 380 of 1993). Ports Petroleum sued first and named Lone Star and Thomas Oil as defendants based on the threatening letters. It further named Governor Jim Guy Tucker and Attorney General Win-

ston Bryant as parties defendant because they constitute the enforcement mechanism under the Act.

Ports Petroleum's declaratory judgment complaint alleged that Act 380 violates the Arkansas and United States Constitutions because it does not require an antitrust injury or predatory intent to run afoul of the Act. Its argument was framed in terms of due process, privileges and immunities, and equal protection violations. Ports Petroleum claimed that, as a practical matter, the prohibition on selling unbranded fuel below cost inhibited fair competition because unbranded fuel sellers are by necessity required to sell a greater volume of fuel at a discounted price in order to compete with branded fuel companies like Exxon and Texaco. It further alleged that the prohibition under Act 380 of below-cost sales violated its property and liberty interests by regulating innocent pricing decisions, which do not adversely affect competition.

Other claims made by Ports Petroleum were: (1) as an unbranded dealer, it does not receive the same protection as branded dealers under the Arkansas Constitution and that the denial of its rights resulted in a deprivation of business opportunity without just compensation, and (2) Act 380 violates the United States Constitution by negating the requirement of antitrust injury in pricing cases, which has the ironic effect of hindering competition and amounts to an unreasonable exercise of the state's police power, all of which is contrary to federal legislation. According to the complaint, the Supremacy Clause of the United States Constitution preempts Act 380. Ports Petroleum prayed for an injunction to halt enforcement of the Act.

The Arkansas Oil Marketers Association ("AOMA") moved to intervene as a defendant in the suit. The organization is comprised of approximately 200 independent petroleum marketers in the state, and, according to the motion, it played an instrumental role in developing the Act. The parties did not oppose the intervention of AOMA, and the trial court granted the motion.

Ports Petroleum moved for summary judgment. Attached to the motion were the two letters of intent to sue by Lone Star and Thomas Oil and an affidavit by Michael D. Ports, the president of Ports Petroleum. In the affidavit, Ports substantiated the

claims in the complaint that unbranded fuel sellers are required to sell at a discount price in order to compete with other types of fuel retailers. Ports also averred that the volume of Fuel Mart sales had dropped since the Jonesboro store raised its fuel price but that the Little Rock price was sufficiently low to sustain its volume of sales. Ports opined that the enforcement of the act would ultimately drive Ports Petroleum out of business.

Ports Petroleum also attached the deposition of Mike Coulson, the former president of AOMA. Coulson described the differences between branded and unbranded fuel markets. He testified that AOMA retained counsel to draft the legislation which was later enacted as Act 380. According to Coulson, the Act does not distinguish between branded and unbranded dealers. He testified that if you do not have a branded product, "then price is probably what you're selling."

As a fifth exhibit, Ports Petroleum attached an affidavit from Leonard A. White, a professor of economics at the University of Arkansas in Fayetteville. He predicted that the Act would cause higher prices and decrease competition, which would injure the consumer. White pointed out that it was not automatically predatory for a business to sell a product at below cost. As examples, he listed giving away a free radio with the purchase of a car and selling gasoline below cost to reap an inflated price on ice cream cones.

Thomas Oil, Lone Star, and AOMA filed a response to Ports Petroleum's motion for summary judgment and filed their own cross-motion for summary judgment. They too attached affidavits. Gerald J. Lynch, an economics professor at Purdue University, analyzed the Act and opined that the dynamic nature of competition will not suffer under the Act. Lynch concluded that "[t]he Act is a reasonable one that will allow dynamic competition [in] the short run, and protect the market from monopoly power in the long run." The affidavit of Professor David R. Kamerschen, a professor of economics at the University of Georgia, was submitted in addition. Kamerschen recognized that below-cost pricing is seldom prudent. He noted that the *per se* rule, as stated in the Act, has advantages in that it offers certainty among businesses with respect to the legality of their pricing schemes. Kamerschen estimated that the Act will ultimately

help more dealers survive in the market place because more dealers will be able to survive competitive price battles.

The affidavit of Al Heringer, the president of Lone Star, was submitted in support of the appellees' cross-motion for summary judgment. He stated that the purchase of fuel is extremely price sensitive regardless of whether it is branded or unbranded. According to Heringer, the fact that a company sells unbranded fuel makes no difference because neither can survive without making a profit.

A hearing was held on the motions, and arguments of counsel were made. The trial court granted summary judgment in favor of the appellees. In its order, the court found:

1. Motor fuel is a commodity of general use and consumption and is impressed with the public interest for purposes of regulation under the State's police power.

2. The purposes of Act 380 of 1993, subtitled the Arkansas Petroleum Trade Practices Act (the "Act"), as set forth in Section 3 of the Act are proper purposes for the exercise of the State's police power.

3. The prohibition of sales of motor fuel at below cost to the retailer of motor fuel unless such sales are exempt under the Act is a reasonable means to accomplish the Act's purposes.

4. The Act is not preempted by federal anti-trust law.

5. The act is rationally related to a legitimate state purpose and does not violate the Arkansas Constitution or the United States Constitution.

The pertinent sections of the Act are sections 3 and 4:

SECTION 3. PURPOSE.

. . . .

(b) Independent and small dealers and distributors of motor fuel are vital to a healthy, competitive market place, but are unable to survive subsidized below-cost pricing at

the retail level by others who have other sources of income. Fair and healthy competition in the marketing of motor fuel provides maximum benefits to consumers in this state, and certain marketing practices which impair such competition are contrary to the public interest. Predatory pricing practices are unfair trade practices and restraints which adversely affect motor fuel competition. Subsidized pricing is inherently predatory because it is unfair and destructive to, and reduces competition in, the motor fuel marketing industry. . . .

(c) Recovery under the anti-trust laws has become increasingly difficult due to the requirement of establishing an "antitrust injury." The legislature has determined that subsidized and predatory pricing presumptively injure competition by damaging independent dealers and distributors of motor fuel. Proof of "antitrust injury." is unnecessary to recover under this act.

SECTION 4. SALES BELOW COST TO RETAILER. (a) No dealer shall make, or offer or advertise to make, sales at retail at below cost to the retailer of motor fuel, where the effect may injure competition, unless such sales at retail are exempt under Subsection (c) or (d) of this Section. . . .

(c) Nothing in this section shall prohibit a dealer from making, or offering or advertising to make, sales at retail of motor fuel which are made in good faith to compete with the equally low or lower retail price of a competitor. However, while the previous sentence allows a dealer to make, offer or advertise, sales at a price equal to the price of a competitor, it does not authorize such dealer to make, offer or advertise to make, sales at retail at a price below such competitor if such sales would be in contravention with the provisions of this section.

(d) The provisions of this section shall not apply:

(i) Where motor fuel is advertised, offered for sale, or sold in a bona fide clearance sale. . . .

(ii) Where motor fuel is sold upon the final liquidation of a business; or

(iii) Where motor fuel is advertised, offered for sale, or sold . . . under the order or direction of any court; or

(iv) Where motor fuel is sold during a grand opening to introduce a new or remodeled business. . . .

The Act then provided that violation would subject the offender to civil penalties of $1,000 a day and three times the amount of actual damages for knowing and willful violations. A showing that the cost exceeded the price constitutes a *prima facie* case. The Act states that it is "remedial" and should be "liberally construed."

This case is one of first impression in Arkansas in that it provides the first opportunity for this court to decide whether the General Assembly may constitutionally abrogate a business's right to sell fuel below cost when there is no requirement that the business intended to put its competition out of business or even to damage it. Indeed, we have found that there is a paucity of authority on this precise point from other jurisdictions as well.

■ It is true, as the appellees underscore, that statutes are presumed constitutional in Arkansas, and if it is possible to construe a statute so as to pass constitutional muster, we will do so. *Clinton* v. *Bonds*, 306 Ark. 554, 816 S.W.2d 169 (1991); *Love* v. *Hill*, 297 Ark. 96, 759 S.W.2d 550 (1988). It is also true that if a statute is penal in nature, it is strictly construed in favor of the offender. *Wal-Mart Stores, Inc.* v. *American Drugs, Inc.*, 319 Ark. 214, 891 S.W.2d 30 (1994); *State Farm Mut. Auto Insur. Co.* v. *Thomas*, 316 Ark. 345, 871 S.W.2d 571 (1994). The penalties in Act 380 render it a clear penal statute, and we must strictly construe it in favor of Ports Petroleum. This is so, even though the Act itself states that it should be liberally construed.

■ We have no hesitation in affirming the trial court on the point that the subject matter of Act 380 falls within the General Assembly's police powers to regulate an industry of general public interest. Unlike the State of Georgia [*see Strickland* v. *Ports Petroleum Co., Inc.*, 353 S.E.2d 17 (Ga. 1987)], we have taken an expansive view of the State's general ability to regulate professions and businesses under its police powers. *See Noble* v. *Davis*, 204 Ark. 156, 161 S.W.2d 189 (1942) (regulatory authority of state over barbers proper in general, though price-

fixing act in question was not a legitimate exercise of state police powers). We have further stated that a commodity of general use and consumption like ready-mixed concrete is impressed with a public interest and, thus, subject to regulation under the police powers of the state. *Concrete, Inc.* v. *Arkola Sand and Gravel Co.*, 230 Ark. 315, 322 S.W.2d 452 (1959). The question then becomes whether the police powers have been used by Act 380 to interfere arbitrarily with the business rights of Ports Petroleum and, thus, violate the due process clause of the Arkansas Constitution. We conclude that that is the case.

■ The issue of an impermissible exercise of state police powers was raised in *Union Carbide & Carbon Corp.* v. *White River Distrib., Inc.*, 224 Ark. 558, 275 S.W.2d 455 (1955). There, the appellant argued that it had the right under the Act in question to require all retailers of Prestone antifreeze to sell its product at a fixed price. This court disagreed and cited Ark. Const. art. 2 § 8, which states that no one can be deprived of property without due process of law. We also observed that the General Assembly has no right to take away a valuable property right unless it has the right by virtue of its inherent police power to protect the public welfare. We concluded:

> We recognize that competition is preserved to a degree under the provisions of the Act, but it must be admitted that it is also restricted to a degree. The Act can be sustained only if it enhances the general welfare and not if it restricts it to only a small extent.
>
> . . . .
>
> The exercise of the [police] power must have a substantial basis and cannot be made a mere pretext for legislation that does not fall within it. The Legislature has no power, under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights.

*Union Carbide*, 224 Ark. at 563, 566, 275 S.W.2d at 458, 460. We held that the price-fixing statute violated the due process clause of the Arkansas Constitution.

■ ■ Admittedly, the distinction between predatory practices and competitive pricing may appear to blur at times. But one point has been made abundantly clear by both this court and the U.S. Supreme Court — the mere fact of cutting prices does not equate to a predatory practice. In *Wal-Mart Stores, Inc.* v. *American Drugs, Inc., supra*, we examined a provision of the Arkansas Unfair Practices Act, which included a prohibition against below-cost sales "for the purpose of injuring competitors and destroying competition." Ark. Code Ann. § 4-75-209(a)(1) (Repl. 1991). We held that the use of loss leaders was not enough to infer an intent to *destroy* competition, as the trial court had done. We added that we were not willing to interpret the Act to contemplate a *prima facie* case of predation absent a clear directive from the General Assembly. We did not reach the issue, however, of whether eliminating predatory intent altogether would comply with constitutional mandates. We quoted with approval from an Eighth Circuit Court of Appeals case concerning the difference between predation and competition relative to lowering prices:

> The difficulty, of course, is distinguishing highly competitive pricing from predatory pricing. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to new competition, or to a downturn in market demand. Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition. *See e.g., Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 231 (1st Cir. 1983).

*Wal-Mart Stores, Inc.*, 319 Ark. at 222, 891 S.W.2d at 35; *quoting Morgan* v. *Ponder*, 892 F.2d 1355, 1358-1359 (8th Cir. 1989).

■ The U.S. Supreme Court in interpreting federal antitrust laws has acknowledged that the purpose of those laws is to permit vigorous price competition and is not to protect firms from losing profits due to competition. *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). The Court noted the perverse result that might flow from disallowing firms to reduce prices to enhance market share:

"[T]he mechanism by which a firm engages in predatory pricing — lowering prices — is the same mechanism by which a firm stimulates competition; because 'cutting prices in order to increase business often is the very essence of competition . . .; mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect.' " *Cargill, supra*, 479 U.S., at 122, n. 17, 107 S.Ct., at 495, n. 17 (quoting *Matsushita, supra*, 475 U.S., at 594, 106 S.Ct., at 1360). It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.

*Brook Group, Ltd.* v. *Brown & Williamson Tobacco Corp.*, 113 S. Ct. 2578, 2589-2590 (1993).

■■ What separates predation from legitimate price cutting is the intent of the predator to damage and destroy competition and then recoup the losses through a greater share of the market. *Brook Group, Ltd.* v. *Brown & Williamson Tobacco Corp., supra.* The one case from a foreign jurisdiction that involved a state statute regulating sales below cost that approximates the facts of the present appeal is *State* v. *Mapco Petroleum, Inc.*, 519 So. 2d 1275 (Ala. 1987). In that case, the Alabama Supreme Court first noted the shift in analysis caused by *Nebbia* v. *New York*, 291 U.S. 502 (1934). In *Nebbia*, the U.S. Supreme Court held that state economic regulation of businesses withstood due process challenges unless the regulation was arbitrary, discriminatory or demonstrably irrelevant to the policy that the legislature is free to adopt, all of which equated to an interference with individual liberty. The Alabama Supreme Court then adopted a standard to use when reviewing state economic regulations for a due process violation:

> Generally speaking, the test is whether the legislation is designed to accomplish an end within legislative competence and whether the means it employs are reasonably designed to accomplish that end without unduly infringing upon protected rights. . . . Specifically, in these "sale below cost" cases, the primary issue will be whether the legislation too broadly imposes restrictions on individuals' liberty to conduct their business as they choose. If the act

penalizes innocent acts not reasonably related to the problem of monopolistic practices or other deceptive, disruptive, or destructive price cutting, the act strikes too broadly.

*Mapco Petroleum*, 519 So. 2d at 1284-1285.

The Alabama Supreme Court then went forward and construed the state's Motor Fuel Marketing Act to prohibit below-cost sales that tended to destroy or substantially lessen competition. But the Court further read into the Act the ability of a defendant to offer the defense of an absence of harmful intent, after the plaintiff had made a *prima facie* case by showing a sale below cost with an injurious effect on competition. What distinguishes the Alabama Motor Fuel Marketing Act factually from the Arkansas Petroleum Fair Practices Act is the Alabama Act does require predatory intent in one section, where Act 380 is devoid of any such provision. Hence, the *Mapco* decision offers little precedential guidance for the case at hand.

Nevertheless, the standard employed by the Alabama Supreme Court in *Mapco* of whether the Act works too broad an impingement on individual liberty is useful. We observe that this standard bears a strong kinship to the one adopted by this court in *Union Carbide & Carbon Corp.* v. *White River Distrib., Inc., supra*, which is quoted above. In the instant case, there is a laudable purpose stated in Act 380 — to foment competition and prevent predation by prohibiting subsidized below-cost pricing at the retail level, which can have a deleterious impact on competition. But is Act 380 reasonably designed to accomplish that purpose? We think not. Indeed, in some instances the Act appears to have exactly the opposite effect from its stated purpose, and the plight of Ports Petroleum is a case in point. The flip side of prohibiting below-cost pricing is that smaller enterprises and single retail outlets (the mom and pop stores) are not able to use this strategy as a means of attracting customers and, thereby, competing with larger firms. Though completely free and innocent of predatory intent, these smaller outlets are foreclosed by the Act from engaging in a pricing mechanism that is one of the few competitive tools they have at their disposal.

The appellees urge that Act 380 bears a rational relationship to a legitimate objective of state government, and for that

reason it cannot be the product of arbitrary action. *See Arkansas Hosp. Ass'n v. Arkansas State Bd. of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73 (1989); *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). But we cannot agree that legislation which hampers innocent and legitimate competition can in any wise be deemed to be rational irrespective of the goal to be accomplished.

We conclude that Act 380 is overbroad in that it prohibits legitimate and innocent competition fostered by below-cost sales. Had the Act included a prohibition against such sales made with predatory intent to damage and destroy competition comparable to what the Arkansas Unfair Practices Act [Ark. Code Ann. § 4-75-209(a)(1) (Repl. 1991)] provides, due process impairment would not be a concern. But here legitimate and innocent below-cost strategies are precluded, and that is a burden on legitimate competition that we cannot condone. Because we reverse due to the absence of an intent to damage and destroy competition, we need not address Ports Petroleum's associated argument that the Act is also deficient in eliminating the element of antitrust injury.

■ We hold that Section 4 of Act 380 of 1993 violates the due process clause of the Arkansas Constitution and is void and of no effect. To the extent Section 4 is independent from the balance of the Act, its invalidity shall not affect the other provisions and applications of the Act. *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349 (1994), *aff'd* ____ U.S. ____, 115 S. Ct. 1842, 129 L. Ed.2d (1995); *Faubus v. Kinney*, 239 Ark. 443, 389 S.W.2d 887 (1965).

Reversed and remanded for entry of an order consistent with this opinion.