Mr. Bill J. Ford, Commissioner Arkansas State Bank Department 323 Center Street, Suite 500 Little Rock, Arkansas 72201-2613
Dear Mr. Ford:
This is in response to your request for an opinion concerning the following:
 The use of the Arkansas Wild Card Statute Sec. 23-47-101
(c) the Arkansas Banking Code of 1997 to authorize the investment proposal of Mercantile Bank, North Little Rock, Arkansas, to organize a limited liability company under the laws of the State of Illinois that will be an operating subsidiary of Mercantile Bank.
You have enclosed correspondence from Mercantile Bank with your request, and that correspondence indicates that Mercantile proposes to create a limited liability company under the laws of the State of Illinois to be an operating subsidiary of Mercantile Bank, which, if approved, will be named "Mercantile Financial of Little Rock L.L.C." The subsidiary would be located in Illinois and would limit its activities to those in which an Arkansas state bank could engage. Mercantile Bank would own 99% of the members' interests in Mercantile Financial and the remaining 1% would be held by Ameribanc, Inc., the sole shareholder of Mercantile Bank. It is also noted that Mercantile Bank would contribute up to $250 million of investment securities to Mercantile Financial in exchange for 99% of the members' interests in the subsidiary. The subsidiary will manage the investment securities contributed by Mercantile Bank, but will not engage in any brokerage or advisory services, underwriting, or make any sales of securities to the general public.
It is noted in the correspondence attached to your request that the operating subsidiary is proposed in order to "enhance and strengthen Mercantile Bank's capital position through an increase in the ability to generate retained earnings" by creating the "ability to isolate and more effectively manage certain assets in the operating subsidiary."
It appears that what is contemplated by this proposal may be the creation of a "finance subsidiary," the characteristics of which have been variously described. See, e.g., John C. Deal,Regulation of Bank Subsidiaries: The FDIC Stakes a Claim, 7 J.L. Com. 1 (1986); 51 F.R. 12560-02 (FDIC Proposed Statement of Policy on Special Purpose Finance Subsidiaries (applicable to state nonmember banks and insured savings banks, April 11, 1986);51 F.R. 45812-01 (FDIC Notice of Withdrawal of Proposed Policy Statement on Special Purpose Finance Subsidiaries, December 22, 1986); and 12 C.F.R. § 545.82 (Office of Thrift Supervision Regulations on the creation of finance subsidiaries by federal savings associations).
It is my understanding that Mercantile Bank of Arkansas is a state nonmember bank, which means it is state-chartered and is not a member of the Federal Reserve System. It is, however, an FDIC insured bank. As such, its operations are governed by the laws of Arkansas, regulations promulgated by the Arkansas State Banking Board, and any applicable FDIC regulations.[1] See Deal,supra, and Scott, The Dual Banking System: A Model of Competitionin Regulation, 30 Stan. L. Rev. 1 (Nov., 1977).
Arkansas law has expressly authorized the creation of state bank operating subsidiaries since 1973. See Act 319 of 1973, § 1(j). The 1973 act provided that such banks could create operating subsidiaries as long as 80% of the voting stock was owned by the parent bank, and the permanent investment of the parent bank in the subsidiary was no more than 10% of its capital and unimpaired surplus. Arkansas banking law, however, has been recently amended by passage of the "Arkansas Banking Code of 1997." See Act 89 of 1997, which became effective May 31, 1997. The provision governing the creation of operating subsidiaries was amended by the new Banking Code of 1997, to retain the 80% voting stock requirement, but to increase the permissible loans and investments in any one operating subsidiary to 20% of the bank's "capital base." A bank may create more than one subsidiary, but may not invest more than 100% of its capital base in all the subsidiaries combined. See Act 89 of 1997, Section 1, Subchapter 6 (creating new Arkansas Code section 23-47-601).[2]
It is indicated in the correspondence attached to your request that Mercantile Bank proposes to invest up to 250% of its "capital and surplus" in Mercantile Financial, and it is admitted that this amount will exceed the 20% "capital base" limit set out in the Arkansas Banking Code. Another provision of the Arkansas Banking Code of 1997, however (the "wild card statute"), is being asserted as authority to exceed the statutory limit.
The Arkansas "wild card statute" was originally passed in 1973.See Act 319 of 1973, § 1(o) (the same act containing the original subsidiary limitation). It was also amended by the Arkansas Banking Code of 1997 and it currently provides as follows:
 In addition to the powers conferred upon state banks under this or any other law of this state, upon action of the Commissioner authorizing state banks to undertake such activities, a state bank may engage in any banking activities in which state banks could engage were they acting as national banks at the time such authority is granted.
See Act 89 of 1997, Section 1, A.C.A. § 23-47-101(c).
As can be seen from the statute, it is an attempt to level the playing field between state banks and national banks, by allowing the Commissioner "to grant state banks the authority to engage in any newly authorized activities for which national banks [are] granted authority." Barrier and Selig, Brave New World: Arkansas'1997 Banking Legislation, The Arkansas Lawyer, Vol. 32, No. 3, at 16 (Summer 1997). The statute was amended in 1997 in only one respect. It now allows the Commissioner to authorize such activities without the approval of the State Bank Board. Id.
The State Bank Board has promulgated a new regulation pursuant to this statute, which provides as follows:
 Pursuant to the power granted to the Commissioner by A.C.A. § 23-47-101(c), the Commissioner, by written order, may authorize state banks to engage in any banking activity then permitted to national banks. Such authority may be subject to such conditions and restrictions as the Commissioner may determine to be appropriate, whether or not any such conditions or restrictions are applicable to national banks.
State Banking Regulations, § R2, 47-101.3 (May 31, 1997).
What is not clear, from either the statute or the regulation, is whether Arkansas' "wild card statute" permits the Commissioner to authorize an activity which is permissible for national banks, but which is contrary to an existing provision of the Arkansas Banking Code. This is the question you have presented to me for resolution.
As noted above, the new Arkansas Banking Code of 1997 limits a state bank's total investment in any one subsidiary to twenty percent of its "capital base." The question presented is whether this express limitation can be overridden by the Bank Commissioner through use of the "wild card statute," as long as national banks are permitted to exceed this limit.[3] A 1995 law review article details the different treatment of this issue by states throughout the country. See Johnson, Wild Card Statutes, Parity,and National Banks — The Renascence of State Banking Powers, 26 Loy. U. Chi.L.J. 351 (Spring 1995). It is noted in this article that (as of 1995) thirty-nine states had passed "wild card statutes" or the equivalent. Id. at 371. Of these, eighteen statutes expressly grant state banks the same powers as those possessed by a national bank, even if such power would contravene state law. Id. at 371. Nine state statutes expressly restrict wild card activities to activities which do not contravene state law. Id. at 371. The remaining twelve state statutes do not specify, or are ambiguous, as to whether or not a wild card activity may be engaged in if it violates another provision of state law. Id. at 371.
The State of Arkansas is listed by the author in the last category, with a statute which does not specify or is ambiguous as to whether the wild card may be invoked to allow an activity which violates another provision of state law. I have found no helpful interpretive case law or Attorney General opinions from these similarly situated states addressing the subject of your inquiry.[4] It appears that in several of these states, the applicable "ambiguous" statutes have been amended since 1995 to expressly address the issue. See, e.g., Oklahoma Banking Code of 1997, Title 6, § 203 (amended to require conformance with state law and regulations); Wisconsin, Stat. 220.04 (8) (amended by Act 27 of 1995 to require conformance with state law); Maine 9-B MRSA § 416 (amended to authorize national bank activities "notwithstanding any other provisions of law"); and Nevada, NRS Title 55, § 662.015 (amended to provide that the Commissioner may, under the wild card statute, modify or waive a requirement of the banking laws). Arkansas has a new Banking Code as of 1997, but the uncertainty on this issue was not addressed therein.
Where a statute is unambiguous, a court gives the language its plain meaning. Weiss v. Central Flying Service, Inc., 326 Ark. 685,934 S.W.2d 211 (1996). When a statute is ambiguous, however, a court must attempt to give effect to the intention of the legislature in adopting the statute. See McGee v. Armorel PublicSchools, 309 Ark. 59, 827 S.W.2d 137 (1992). If the language is uncertain, the Arkansas Supreme court may look to the subject matter of the statute, the object to be accomplished, or the purpose intended, as well as other extrinsic matters which shed light on the legislative intent. John B. May Co. v. McCastlain,244 Ark. 495, 426 S.W.2d 158 (1968). To ascertain the intent of the legislature with respect to a statute, a court will examine the statute historically, the contemporaneous conditions at the time of its enactment, the consequences of interpretations, and other matter of common knowledge within the limits of its jurisdiction. See Mears v. Arkansas State Hospital, 265 Ark. 844,581 S.W.2d 339 (1979).
I cannot conclude, based upon the plain language and the legislative history of the "wild card statute," that the Arkansas Banking Commissioner has clear authority to authorize a state bank to undertake an activity under the wild card statute which is contrary to another provision of Arkansas law. There is some ambiguity surrounding the question, however, and a judicial determination of the matter is the only avenue of concrete resolution.
With regard to the history of the relevant statutes, as noted previously, the original wild card statute and the original limitation on the amount a state bank can invest in an operations subsidiary were passed by virtue of the same act. Act 319 of 1973 is entitled "AN ACT to Enlarge the Power of State Chartered Banks," and it enumerated many newly authorized activities in which state banks could engage, including the power to create operations subsidiaries (with the investment restriction). The last provision of the newly enumerated powers is the original "wild card statute" which stated that: "In addition to the powersconferred upon banks under this or any other law of this state . . . the Bank Commissioner . . . shall have power to authorize state banks to engage in any banking activities in which said banks could engage were they acting as national banks at the time such authority is granted." Act 319 of 1973, Section 1 (o) (emphasis added). This act authorized state banks to engage in newly expanded powers, with applicable restrictions, and then provided that "in addition to" those powers, the Commissioner could authorize the exercise of additional powers granted to national banks. The provision appears to be forward-looking; that is, it sets out provisions governing expanded banking powers and then contemplates the Commissioner authorizing state banks to engage in additional or "newly authorized" national bank activities. See
Barrier and Selig, supra, at 16.
I cannot infer from the legislative history of the wild card statute an intention to authorize the Commissioner to override one of the restrictions appertaining to the newly expanded banking powers granted earlier in the same act.[5] The use of the language "in addition to" rather than language such as "notwithstanding any other provision," is in my opinion significant. Had the legislature intended to allow the override of provisions of the same enactment, it would have been a small matter for it to include the latter phraseology. Each of the relevant provisions (the wild card statute, and the operations subsidiary investment restriction) were thoughtfully considered and amended by the new Arkansas Banking Code of 1997. See Id., at 16 (regarding the work of the Governor's Task Force to Revise the Banking Laws). Again, if there was an intention to authorize any override of the applicable limitation, whether through use of the wild card statute or otherwise, it could have easily been so stated.
Finally, the new regulation adopted by the Arkansas State Bank Board is in my opinion instructive. It states that any authority granted pursuant to the wild card statute may be subject to such conditions and restrictions as the Commissioner may determine, "whether or not any such conditions or restrictions are applicable to national banks." This regulation does not interpret the Arkansas wild card statute as requiring absolute parity with national banks regardless of state objectives. It leaves open the door to the imposition of state restrictions. In addition, it is my understanding that the Commissioner has historically interpreted the wild card statute as being limited by the provisions of state law. Ordinarily, agency interpretations of statutes are afforded great deference, even though they are not binding, and will not be overturned unless clearly wrong.Arkansas State Medical Board v. Bolding, 324 Ark. 238,920 S.W.2d 825 (1996).
For all the foregoing reasons, it is my opinion that there is no clear authority under the Arkansas "wild card statute" for the proposed investment in Mercantile Financial, where the investment would violate a separate provision of Arkansas law. The plain language of the statute and its legislative history do not, in my opinion, support such a construction. The wild card statute itself, however, places the duty to make initial determinations in this regard with the Bank Commissioner. Responsibility to determine this matter thus lies with the Commissioner, after careful consideration of the foregoing legal analysis.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] State nonmember banks would, of course, also be subject to any provision of federal law made applicable to them by virtue of the Supremacy Clause of the United States Constitution. That is, the federal government could pass laws preempting applicable state banking provisions. My research of the complex federal law relating to the banking industry, however, has disclosed no express provision of federal law applicable to state nonmember banks which would preempt Arkansas' twenty percent capital base restriction on investing in operations subsidiaries. But cf.12 U.S.C. § 378 (not prohibiting state banks from exercising the same powers as national banks in dealing in, underwriting, purchasing, selling or issuing securities); and 12 C.F.R. §§ 337.4; 362.1; 362.2; 362.3 and 362.4 (regulating the securities activities of insured nonmember banks and not prohibiting insured state banks from acquiring or retaining a majority interest in a subsidiary). Neither does such law appear to be preempted as to state member banks. But cf. 12 U.S.C. § 335 and 12 C.F.R. 250.141(d), which provide respectively that "[s]tate member banks shall be subject to the same limitations and conditions with respect to the purchasing, selling, underwriting, and `holding' of investment securities and stock as are applicable in the case of national banks under paragraph `Seventh' of section 24 of this title"; and that this same provision (12 U.S.C. § 24 "Seventh") "should not be interpreted to preclude a member bank from [creating an operations subsidiary] unless its use would be inconsistent with other federal law, either statutory or judicial."
[2] The FDIC apparently does not have any set limitation on the permissible investment which may be made by a state nonmember bank in a finance subsidiary. In 1986, the FDIC proposed an investment limit of ten percent of the bank's "total assets," but later withdrew the proposal for a number of reasons. See51 F.R. 12560-02 and 51 F.R. 45812-01. Many comments received by the FDIC expressed the belief that this limitation was too restrictive, and should be more in the range of twenty to thirty percent of total assets. The FDIC now apparently regulates the creation of such subsidiaries on a "case-by-case basis" with a view toward whether the activities result in the conduct of business in an "unsafe and unsound" manner. Id.
[3] It appears that the proposed action would be permissible under federal law for a national bank. Such banks are of course authorized to create operating subsidiaries. See 12 C.F.R. 5.34. One provision of this regulation indicates that a permissible purpose of such a subsidiary is the "owning, holding, and managing [of] all or a part of the parent bank's investment portfolio."Id. at § (e)(2)(ii)(N). There does not appear to be any applicable express investment limit. The question of whether the activity described in your request is permissible under federal law is, of course, a question to be determined by the relevant federal regulatory agencies. I will assume, however, for purposes of reaching your state law question, that the activity described would be permissible for a national bank.
[4] See generally, however, Op. Alaska Att'y Gen. Nos. J99-096-80, J-66-051-81 (Aug. 4, 1980); 1980 Op. Ill. Att'y Gen. Nos. 70, 72 (Apr. 15, 1980); and 1974 Op. Ill. Att'y Gen. No. 82 (Feb. 14, 1974).
[5] It is generally held, on constitutional grounds, that the legislature may not vest an administrative agency with an uncontrolled power to vary, change, or suspend the application of a statute. See 73 C.J.S. Public Administrative Law and Procedure, §§ 27, 30, and 32. It has also been held as a general rule that an administrative regulation cannot be contrary to a statute. SeePledger v. C.B. Form Co., 316 Ark. 22, 871 S.W.2d (1994), citingState v. Burnett, 200 Ark. 655, 140 S.W.2d 673 (1940). These rulings are based on the constitutional separation of powers doctrine and the fact that legislative power is vested exclusively in the legislative branch. See, e.g., Morrow DevelopmentCorporation v. American Bank and Trust Company, 816 P.2d 537
(Okla. 1991) (striking down a state bank regulation promulgated under the wild card statute which was contrary to a separate state statute). See also however, Wisconsin Op. Att'y Gen. (Nov. 19, 1982) (former Wisconsin wild card statute was not unconstitutional on its face as an unlawful delegation of legislative authority). It is unnecessary to engage in an analysis of whether the Arkansas wild card statute is objectionable on constitutional grounds, however, as I opine today that as a matter of statutory construction, the wild card statute does not authorize the Commissioner to override the provisions of a separate state statute. In addition, statutes will be construed, if at all possible, as constitutional. See, e.g., Ports Petroleum Co. Inc.of Ohio v. Tucker, 323 Ark. 680, 916 S.W.2d 749 (1996). I will not infer, therefore, where the statute is ambiguous, a legislative intention or construction of Arkansas' wild card statute which would raise arguable constitutional questions.